# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| RITCHIE CT OPPS, LLC, a Delaware Limited Liability Company, as successor in interest to RITCHIE ENERGY, LLC, a Delaware Limited Liability Company, by and through its Managing Member, RITCHIE PARTNERS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HUIZENGA MANAGERS FUND, LLC, a Delaware Limited Liability Company, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) C.A. No. 2018-0196-SG ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: February 6, 2019
Date Decided: May 30, 2019

John A. Sensing and Ryan C. Cicoski, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Plaintiff*.

Steven L. Caponi, of K&L GATES LLP, Wilmington, Delaware; OF COUNSEL: Gary W. Garner and Jonathan Miller, of WILLIAMS MONTGOMERY & JOHN LTD., Chicago, Illinois, *Attorneys for Defendant*.

GLASSCOCK, Vice Chancellor

Before me is a Motion to Dismiss the Plaintiff's Amended Complaint, which alleges that the Defendant has breached contractual confidentiality and non-disparagement clauses of its contract with the Plaintiff's predecessor in interest. The questions presented are straightforward: Does the Plaintiff have standing to enforce the interests represented in its claims? Are the necessary parties before the Court? Does the absolute litigation privilege trump a contractual non-disparagement provision?

As the reader with fortitude to carry on will quickly discover, however, the procedural and factual background necessary to the decision are not so straightforward. The Defendant is an investor in one of a blizzard of entities created by A.R. Thane Ritchie to promote and service investments. The number of interrelated entities has frustrated my well-intentioned attempt to represent their relationship graphically, so that what follows is my attempt to explain that relationship in prose. Also challenging is the thicket of interrelated lawsuits involving the Defendant and Mr. Ritchie's entities, including at least four filed in this jurisdiction, as well as numerous others. After an attempt to navigate this factual and procedural sargassum, I address the substantive questions, and determine that the Motion to Dismiss must be granted, for the reasons explained below.

# I. BACKGROUND

The following facts, drawn from the Plaintiff's Amended Complaint, are presumed true for purposes of evaluating the Defendant's Motion to Dismiss.

## A. *The Parties*

The Plaintiff, Ritchie CT Opps, LLC ("Opps"), is a Delaware limited liability company, with a registered office in Wilmington, Delaware.[1] Its managing member is Ritchie Partners LLC ("Partners"), which is also a Delaware limited liability company.[2] Ritchie Energy, LLC ("Energy") was a Delaware limited liability company with its principal place of business in the Cayman Islands.[3] Energy was formed in 2004.[4] On November 27, 2017, Energy assigned all of its rights, title, and interest to Ritchie Multi-Strategy Global, LLC ("Global").[5] Energy then filed a Certificate of Cancellation with the Delaware Secretary of State.[6] Thereafter, on February 6, 2018, Global transferred the rights, title, and interest it received from Energy to Opps.[7]

The Defendant, Huizenga Managers Fund, LLC ("Huizenga"), is a Delaware limited liability company, with a principal place of business in Oak Brook, Illinois.[8]

---

[1] Am. Compl. ¶ 11.
[2] *Id.* ¶ 12.
[3] *Id.* ¶ 10.
[4] *Id.* ¶ 17.
[5] *Id.* ¶ 10.
[6] *Id.*
[7] *Id.* ¶ 11.
[8] *Id.* ¶ 13.

It is managed by Huizenga Capital Management, LLC, an Illinois limited liability company.[9] Huizenga is a private investment fund,[10] and was an investor in Energy.[11]

### B. Huizenga Invests in Ritchie Energy

#### 1. "Ritchie"

The name "Ritchie" is used as a brand name for a family of private investment funds.[12] It is derived from an individual, A.R. Thane Ritchie (Mr. Ritchie).[13] Mr. Ritchie formed, oversaw, and developed the "Ritchie" family of investment funds.[14] Under the structure devised by Mr. Ritchie, Global pools investments from qualified purchasers, and then invests the majority of that pooled capital into an offshore pooled investment vehicle, known as the "MSG Master Fund."[15] The MSG Master Fund, in turn, invests in a number of other pooled investment vehicles ("Strategy Funds"), which are committed to certain classes of assets or certain investment strategies.[16] The Strategy Funds are located globally but are often restricted to the investments they receive from the MSG Master Fund.[17] In addition to Global, the MSG Master Fund, and the Strategy Funds, there are a variety of "Ritchie" entities

---

[9] *Id.*
[10] *Id.* ¶ 27.
[11] *Id.* ¶¶ 1, 29, 30.
[12] *Id.* ¶ 16.
[13] *Id.* ¶ 25. I refer to A.R. Thane Ritchie as "Mr. Ritchie," in order to differentiate Mr. Ritchie, an individual, from the various affiliated entities which also bear the name "Ritchie."
[14] *Id.*
[15] *Id.* ¶ 19.
[16] *Id.* ¶ 20.
[17] *Id.* ¶ 21.

that provide services to the various Funds; services such as day-to-day management, advisement on new and existing investments, and raising capital.[18] Pertinent here is Ritchie Capital Management, Ltd. ("Capital Ltd."), a Cayman Islands company with its principal place of business in the Cayman Islands.[19] Capital Ltd. is an investment manager; it managed Global, the MSG Master Fund, and the Strategy Funds.[20]

While not explicitly pled in the Amended Complaint, it appears that Energy was a Strategy Fund.[21] According to Energy's Operating Agreement, Partners was the "Managing Member" of Energy.[22] Capital Ltd. was Energy's "Investment Manager."[23] Ritchie Capital Management, LLC ("Capital LLC") was Energy's "Sub-Advisor."[24]

2. Huizenga Invests in Ritchie Energy

In October 2002, Huizenga executed a subscription agreement with Global.[25] Through the subscription agreement, Huizenga was allowed to purchase membership interests in limited liability companies within Global.[26] On September 1, 2004, Huizenga entered into the Ritchie Energy Subscription Agreement (the

---

[18] *Id.* ¶ 23.
[19] *Id.* ¶ 24.
[20] *Id.* ¶¶ 24–26.
[21] Answering Br. in Opp'n to Mot. to Dismiss Am. & Suppl. Verified Compl. [hereinafter Answering Br.], at 3.
[22] Am. Compl. ¶ 36.
[23] *Id.*
[24] *Id.*
[25] *Id.* ¶ 28.
[26] *Id.*

"Subscription Agreement").[27]  In return for signing the Subscription Agreement and investing $1.5 million, Huizenga received a $1.5 million limited liability company interest in Energy.[28]  On September 29, 2004, Huizenga entered into the Additional Investment Subscription Form (the "Additional Investment Subscription Form") and purchased an additional $3.5 million interest in Energy.[29]  Huizenga's additional investment was subject to all the terms and conditions of the Subscription Agreement.[30]

### 3. The Terms of Huizenga's Investment in Ritchie Energy

#### a. Ritchie Energy's Operating Agreement

Energy's Operating Agreement (the "Operating Agreement") is dated July 1, 2004.[31]  The Operating Agreement references not only "Member[s]" of Energy, but also "RCM Part[ies]."[32]  A "Member" is "a Member of the Company, including the Managing Member."[33]  The "Managing Member," as mentioned, was Partners, however, the term was also defined in the Operating Agreement to include the Sub-Advisor (Capital LLC) and the Investment Manager (Capital Ltd.).[34]  "RCM" is a

---

[27] *Id.* ¶ 29.
[28] *Id.*
[29] *Id.* ¶ 30.
[30] *Id.*
[31] *See id.*, Ex. C.
[32] *See generally id.*
[33] *Id.*, Ex. C, § 1.6, Definitions, "Member."
[34] *Id.*, Ex. C, § 1.6, Definitions, "Managing Member," "Investment Manager," "Sub-Advisor;" *see also id.* ¶ 36.

5

defined term in the Operating Agreement; it includes "the Managing Member, the Investment Manager, the Sub-Adviser, and any of their respective Affiliates, which will, collectively, manage the trading and investing of the Company and the Master Fund, and any of their successors or assigns."[35] A "RCM Party" is "(a) RCM, (b) any Affiliate of RCM, and (c) any owner, principal, director, officer or employee of any of the foregoing."[36] An "Affiliate" of a person[37] is "a Person controlling, controlled by or under common control with, that Person, either directly or indirectly through one or more intermediaries."[38]

According to the Operating Agreement, "[e]ach Member agrees not to disparage [Energy][39] or any RCM Party regarding any of the transactions contemplated hereby, providing that nothing in this **Section 8.22** shall prevent or limit any disclosure a Member reasonable believes such Member is required to make pursuant to Law."[40] Furthermore, as part of the Operating Agreement:

> Each Member covenants that, except with the prior written consent of the Managing Member, it has and it shall at all times keep confidential and not, directly or indirectly, disclose, divulge, furnish or make accessible to anyone, or use in any manner that would be adverse to the

---

[35] *Id.* ¶ 36; *see also id.*, Ex. C, § 1.6, Definitions, "RCM."

[36] *Id.* ¶ 35; *see also id.*, Ex. C, § 1.6, Definitions, "RCM Party." References to a "RCM Party" or to "RCM Parties" in this Opinion use this definition.

[37] A "Person" is defined as "any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, government . . . or other entity, whether or not having legal personality." *Id.* ¶ 35 n.1; *see also id.*, Ex. C, § 1.6, Definitions, "Person."

[38] *Id.* ¶ 35 n.1; *see also id.*, Ex. C, § 1.6, Definitions, "Affiliate."

[39] The "Company" was defined as "Ritchie Energy, L.L.C., the Delaware limited liability company governed by this Agreement." *Id.*, Ex. C, § 1.6, Definitions, "Company."

[40] *Id.* ¶ 43; *id.*, Ex. C, § 8.22.

interests of [Energy] or any RCM Party, any confidential or proprietary information to which such Member has been or shall become privy relating to the business or assets of the Company or of any of the RCM Parties . . . .[41]

The Operating Agreement, "[w]ithout limiting the generality of the foregoing," specifically defines confidential and proprietary information to include:

(i) the identities of the personnel of [Energy] and the RCM Parties, (ii) the specific investment techniques utilized by [Energy], (iii) any information regarding a Member, (iv) the performance record of [Energy], and any other financial results or data of [Energy], (v) any communication from any RCM Party or any of its representatives or Affiliates and (vi) the RCM Intellectual Property . . . .[42]

Confidential information could be disclosed when the information was "otherwise publicly available (other than information made publicly available by a Member relying on this exemption in disclosing such information) or required to be disclosed by Law . . . ."[43] However, even under the exceptions, members of Energy were required to first inform the Managing Member before disclosing confidential information and to give the Managing Member an opportunity to contest whether the information had been made public or whether disclosure was required by Law.[44] Confidential information could be shared by members with certain "Permitted

---

[41] *Id.* ¶ 46; *id.*, Ex. C, § 8.21(b).
[42] *Id.* ¶ 44; *id.*, Ex. C, § 8.21(c).
[43] *Id.* ¶ 47; *id.*, Ex. C, § 8.21(b).
[44] *Id.* ¶ 47; *id.*, Ex. C, § 8.21(b).

Confidants," such as attorneys and accountants, as long as the confidants held the information in strict confidence and did not use it for personal gain.[45]

Members of Energy agreed, in the Operating Agreement, that breaches of the covenants associated with confidentiality could lead to irreparable harm, for which monetary damages would not be sufficient.[46] "Accordingly, each Member agrees that [Energy] and Managing Member, separately or together, shall be entitled to equitable and injunctive relief, on an emergency, temporary, preliminary and/or permanent basis, to prevent any such breach or the continuation thereof."[47] Finally, the Operating Agreement prohibited Members from doing "indirectly — by the use of Affiliates, agents, agreements, contracts, reciprocal business dealings or any other means — that which such Member has agreed not to do directly."[48]

### b. Huizenga's Subscription Agreement and Additional Investment Subscription Form

Huizenga's Subscription Agreement was signed on September 1, 2004. Terms used but not defined by the Subscription Agreement were given the definitions and meaning set forth in the Operating Agreement.[49] The Subscription Agreement also incorporates the Operating Agreement by reference; Huizenga

---

[45] *Id.* ¶ 50; *id.*, Ex. C, § 8.21(b).
[46] *Id.* ¶ 51; *id.*, Ex. C, § 8.21(f).
[47] *Id.*, Ex. C, § 8.21(f); *see also id.* ¶ 51.
[48] *Id.*, Ex. C, § 8.19; *see also id.* ¶ 52.
[49] *Id.* ¶ 32; *id.*, Ex. A, § 1.

8

"agrees to be bound by the provisions of the Fund's Operating Agreement."[50]  In the Subscription Agreement, Huizenga specifically agreed to the Operating Agreement, "including without limitation the confidentiality . . . covenants set forth in Section 8.2 of the Operating Agreement."[51]  Furthermore, according to the Subscription Agreement, "[n]either [Huizenga] nor any representative of [Huizenga] shall publicly disparage [Energy] or any RCM Party."[52]  As mentioned, Huizenga's additional investment on September 29, 2004 was also made according to the terms and conditions of the Subscription Agreement.[53]

### C. Huizenga and "Ritchie" Fall Out

#### 1. Litigation in Illinois

In 2007, Huizenga filed suit against Mr. Ritchie, Capital LLC, and an entity named Ritchie Risk-Linked Strategies, LLC ("Risk-Linked Strategies"), and several other parties, in Illinois (the "Illinois DSA Action").[54]  Huizenga alleged that the defendants in the Illinois DSA Action violated the Delaware Securities Act (the "DSA") by failing to disclose certain information related to Risk-Linked Strategies.[55]  Huizenga had made two investments in Risk-Linked Strategies, which were governed by a separate subscription agreement from the Subscription

---

[50] *Id.* ¶ 32; *id.*, Ex. A, § 2(f).
[51] *Id.*, Ex. A, § 17.
[52] *Id.*, Ex. A, § 16; *see also id.* ¶ 43.
[53] *Id.* ¶ 30; *id.*, Ex. B.
[54] *Id.* ¶ 55.
[55] *Id.*

Agreement at issue here.[56] In 2015, the Illinois trial court in the Illinois DSA Action found that the Ritchie defendants violated the DSA with regard to the second Risk-Linked Strategies investment and entered a final judgment against them.[57] On appeal, the Illinois appellate court affirmed the violation with regard to the second investment, and found that the first investment in Risk-Linked Strategies also violated the DSA.[58]

According to the Amended Complaint, Huizenga has, through subsequent litigation in Illinois and through related legal actions in other states, made public RCM Party confidential information.[59] The Amended Complaint alleges that through the litigation in Illinois, as well as the related disclosure of RCM Party confidential information, Huizenga has disparaged RCM Parties.[60] Additionally, per the Amended Complaint, attorneys representing Huizenga are not holding RCM Party information confidential, and furthermore, because Huizenga's attorneys are purportedly working on a contingency fee basis they are using confidential information for "personal gain."[61]

For example, Huizenga made public RCM Party confidential information in January 2018 when it publicly filed an amended complaint against several RCM

---

[56] *Id.*
[57] *Id.* ¶ 56.
[58] *Id.* ¶ 57.
[59] *See, e.g., id.* ¶¶ 58, 60, 63, 65.
[60] *Id.* ¶¶ 58–59.
[61] *Id.* ¶ 60.

Parties in an Illinois action related to a dispute over the appeal bond issued in connection with the appeal of the Illinois trial court's judgment in the Illinois DSA Action.[62] In the same Illinois action regarding the appeal bond, in February 2018, Huizenga then publicly filed a memorandum and exhibits, which also contained RCM Party confidential information.[63] The publicly filed exhibits included information "detailing the identity, assets, property ownership, and potential whereabouts of Thane Ritchie and other affiliated parties."[64] The public exhibits also included a non-public organizational chart that discloses the relationship between certain RCM Parties.[65] In addition, Huizenga disclosed "allegations regarding the income and assets of [Capital LLC] and other RCM Parties," and the identity of "Ritchie personnel responsible for controlling and directing payments made by and from RCM Parties."[66]

Furthermore, in March 2018, Huizenga served a New York Information Subpoena upon Millennium Technology Value Partners L.P. ("Millennium") in an effort to recover a management fee owed to one of the judgment debtors in the Illinois DSA Action.[67] The Plaintiff alleges that Huizenga learned the identity of Millennium and its relationship to the RCM Parties from confidential information

---

[62] *Id.* ¶ 62.
[63] *Id.*
[64] *Id.* ¶ 63.
[65] *Id.*
[66] *Id.*
[67] *Id.* ¶ 64.

11

provided to Huizenga as an investor in certain of the RCM Parties.[68] In April 2018, Huizenga served an Illinois "Citation to Discover Assets" upon Interactive Brokers, LLC, an electronic brokerage firm, including for an entity named Alpha Carta Ltd., which Huizenga alleged was an Illinois DSA Action judgment debtor.[69] Interactive Brokers, LLC thereafter froze the assets of Alpha Carta Ltd. and prevented it from making trades through Interactive Brokers, LLC.[70] The Plaintiff alleges that Huizenga learned the identity of Alpha Carta Ltd. and its relationship to the RCM Parties from confidential information provided to Huizenga as an investor in certain of the RCM Parties.[71] According to the Plaintiff, Huizenga provided the identity of Millennium and Alpha Carta Ltd. to its attorneys in violation of contractual obligations to keep such information confidential.[72]

In May 2018, Huizenga filed a second amended complaint in the Illinois action related to the appeal bond.[73] The second amended complaint included confidential information (for example, regarding the assignment of rights between the RCM Parties) and is disparaging of RCM Parties (for example, alleging that Mr.

---

[68] *Id.* ¶ 65.
[69] *Id.* ¶ 66.
[70] *Id.*
[71] *Id.* ¶ 67.
[72] *Id.* ¶¶ 65, 67 (alleging that, under a contingent-fee representation agreement, Huizenga's attorneys used RCM Party confidential information for financial gain, contravening the confidentiality provisions).
[73] *Id.* ¶ 68.

Ritchie has used RCM Parties as a "piggybank").[74]  Per the Amended Complaint, Huizenga has made, either orally or in writing, other disparaging remarks regarding Mr. Ritchie or an RCM Party such as: "international fraudster," "fraudulently avoiding creditors," "using foreign citizenship for the purposes of engaging in illicit financial activities or financial crimes," among others.[75]  The Plaintiff cites only to court documents filed by Huizenga in various actions in Illinois as specific support for disparaging statements made by Huizenga about a RCM Party.[76]

*D. Relevant Events after the Filing of this Action*

It is relevant to the motion to dismiss analysis[77] to detail certain related litigation filed in other courts, and certain events that have occurred since the original Complaint was filed.[78]  Opps filed its original Complaint on March 19, 2018, before some of the events referenced above occurred, and then its Amended Complaint on June 18, 2018.

---

[74] *Id.* ¶ 69.

[75] *Id.* ¶ 73; *see also id.* ¶ 74.

[76] *See id.* ¶ 74.

[77] The Defendant has moved to dismiss the Plaintiff's claims, in part, in light of these other litigations.  *See* Opening Br. in Support of Its Mot. to Dismiss Am. And Suppl. Verified Compl. [hereinafter Opening Br.], at 16–30.

[78] The parties, at my request, jointly submitted a helpful timeline detailing all other relevant litigations to this action, I draw the facts below from that stipulated timeline. *See* D.I. 77 [hereinafter, "Litigation Timeline"].

### 1. The Actions in Illinois

For reference, the Illinois DSA Action was filed on April 6, 2007.[79] As mentioned above, it resulted in two judgments against the defendants for violating the DSA; the defendants included Mr. Ritchie, Capital LLC, and Risk-Linked Strategies.[80] The first judgment was paid via appeal bond in 2017, and the second judgment was paid in 2018.[81] On June 18, 2018, Risk-Linked Strategies filed a Petition to Vacate in the Illinois DSA Action, which was dismissed.[82] The parties are currently briefing Huizenga's motions for sanctions (brought in response to the Petition to Vacate) and entitlement to attorneys' fees and costs.[83] However, Huizenga and the RCM Parties have also brought other litigation against each other in Illinois and in Delaware.

#### a. The Cook County Fraud Action

On September 13, 2017, Huizenga filed an action (the "Cook County Fraud Action") against Mr. Ritchie, Capital Ltd., Partners, Risk-Linked Strategies and another RCM Party, and their insurers, in Cook County, Illinois.[84] Huizenga alleges fraud, civil conspiracy, and fraudulent transfer.[85] This appears to be the litigation

---

[79] Litigation Timeline, at 1.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* at 2.
[85] *Id.*

concerning the appeal bond, referenced above.[86] Huizenga has since settled with the insurers.[87] Huizenga, with the agreement of the remaining defendants, was granted leave to file a third amended complaint by January 8, 2019.[88]

### b. The DuPage County Action

On January 31, 2018, two "John Doe" entities filed an action in Illinois (the "DuPage County Action") against Huizenga.[89] The John Doe plaintiffs sought injunctive relief for breach of contractual non-disparagement and confidentiality provisions.[90] The plaintiffs voluntarily dismissed their claims without prejudice; however, Huizenga moved for sanctions.[91] The Illinois Court deemed sanctions appropriate, and the parties are currently in discovery on sanctions, in advance of an evidentiary hearing.[92]

### c. The Cook County Injunction Action

On March 8, 2018, Global, through its Managing Member, Capital Ltd., brought an action against Huizenga in Illinois (the "Cook County Injunction Action").[93] The plaintiff seeks injunctive relief for breach of contractual non-

---

[86] Am. Compl., Exs. D, F (noting case number 17-L-9244); Litigation Timeline at 2 (noting case number 17-L-9244).

[87] Litigation Timeline, at 2.

[88] *Id.*

[89] *Id.* at 2–3.

[90] *Id.* at 2–3.

[91] *Id.*

[92] *Id.*

[93] *Id.* at 3.

15

disparagement and confidentiality provisions.[94]  Huizenga has moved to dismiss the complaint.[95]  Its motion to dismiss is currently pending.[96]  The Illinois Court has already granted a Huizenga motion for sanctions in the action.[97]

### 2. The Delaware Superior Court Action

On May 3, 2018, Global filed an action in Delaware Superior Court against Huizenga (the "Delaware Superior Court Action").[98]  Global's claims relate to contractual confidentiality and damages related to the Illinois DSA Action.[99]  Huizenga filed a motion to dismiss, which was argued on December 17, 2018.[100]  The Delaware Superior Court Action was stayed on January 19, 2019.[101]

Risk-Linked Strategies has since filed a petition for Chapter 11 bankruptcy in United States Bankruptcy Court of the District of Delaware.[102]

*E. Procedural History*

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.* at 4.  This is the second of three related cases filed in Delaware Superior Court.  The first was filed on May 24, 2017 by Mr. Ritchie, Capital LLC, Partners, and Risk-Linked Strategies, who sought contractual indemnification for judgment and fees in relation to the Illinois DSA Action.  *Id.* at 2.  The Delaware Superior Court stayed the case pursuant to *McWane*. *Id.* at 2.  A third action was filed on August 24, 2018 in which Risk-Linked Strategies, Capital Ltd., and an entity named Ritchie Multi-Strategy Global Trading, Ltd. brought a contractual claim for fees incurred, as alleged subrogees of non-liable parties, in the Illinois DSA Action.  *Id.* at 4.

[99] *Id.* at 4.

[100] *Id.*

[101] *See* D.I. 81; D.I. 83; *Ritchie Multi-Strategy Global, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 194353 (Del. Super. Jan. 15, 2019).

[102] Litigation Timeline, at 4.

16

Opps filed its original Complaint against Huizenga on March 19, 2018. Opps also sought a Temporary Restraining Order (a "TRO") to enjoin Huizenga from disclosing confidential information and disparaging Opps and other RCM Parties. At a TRO Hearing on March 27, 2018, the parties reached a verbal agreement governing their litigious behavior in existing litigations elsewhere and I agreed to stay the Motion for a TRO. However, within a month, Opps asked to lift the stay and renewed its Motion for a TRO. I held another TRO hearing on April 26, 2018, where I agreed to lift the stay and denied the Motion for a TRO, but I entered a Bench Order to govern certain litigious behavior in any new action brought by Huizenga against a RCM Party. Opps then filed an Amended Complaint on June 18, 2018.

Huizenga filed a Motion to Dismiss the Amended Complaint on June 29, 2018. On August 22, 2018, Opps submitted a letter alleging that Huizenga had, in connection with the action in the United States Bankruptcy Court of the District of Delaware, violated the March 27, 2018 verbal agreement. Huizenga responded by letter on August 27. I held Oral Argument on the Motion to Dismiss on November 9, 2018.[103]

---

[103] In addition to briefing, I also received a supplemental letter from Huizenga on October 16, 2018. *See* D.I. 69.

At Oral Argument I asked the parties for supplemental submissions, which they have provided.[104] On December 31, 2018, the parties submitted letter briefs on the applicability of this Court's decision in *CapStack Nashville 3 LLC v. MACC Venture Partners* to the Motion to Dismiss.[105] On December 31, 2018, the parties also jointly submitted a timeline detailing the various other litigations in which Huizenga is engaged with parties related to Opps.

The parties submitted further supplemental letters on January 17, January 24, and February 6, 2019 related to the Motion to Dismiss; these letters detailed further developments in the other related litigation. After receiving the February 6 letter (and as I confirmed during a Teleconference on February 8),[106] I considered the Motion to Dismiss submitted for decision.

## II. ANALYSIS

On March 19, 2018, Plaintiff Opps filed a Complaint against Defendant Huizenga alleging two counts of breach of contract. According to Opps, Huizenga

---

[104] Unrelated to the Motion to Dismiss, I asked the parties to jointly submit a summary of the events in the Delaware Bankruptcy Action that have occurred since the parties' August 22 and 27, 2018 letters. The parties filed their joint summary on February 1, 2019. *See* D.I. 86.

[105] 2018 WL 3949274 (Del. Ch. Aug. 16, 2018).

[106] The February 8, 2019 teleconference dealt primarily with the parties' August 22 and 27, 2018 letters. On February 18, 2019 (as discussed in the February 8, 2019 teleconference), Ritchie CT Opps formally filed a Motion for Sanctions related to the Delaware Bankruptcy Action. The Motion for Sanctions was fully briefed on March 4, 2019. In the interim, on February 26, 2019, Huizenga filed a Motion for Relief from the March 2018 verbal agreement. However, on March 4, 2018, Ritchie CT Opps also filed a Motion to Strike both Huizenga's answering brief in the Motion for Sanctions and Huizenga's opening brief in the Motion for Relief. The parties have since briefed the Motion to Strike. I do not address these motions in this Opinion.

had breached the confidentiality provisions of Energy's Operating Agreement and Huizenga's Subscription Agreement with Energy. Additionally, per Opps, Huizenga had breached the non-disparagement provision of Huizenga's Subscription Agreement with Energy (Opps does not allege that Huizenga breached the non-disparagement clause in Energy's Operating Agreement). Opps seeks only injunctive relief. On June 18, 2018, Opps filed an Amended Complaint, which expanded, in part, but did not substantively change the breach of contract claims. Huizenga moved to dismiss the Amended Complaint on several grounds. I turn first to Huizenga's argument that Opps lacks standing, which, I find, supports dismissal of Opps' contractual confidentiality claim. Thereafter, I consider Huizenga's argument that the remaining claim for contractual non-disparagement should be dismissed, pursuant to Rule 12(b)(6), because it is barred by Delaware's absolute litigation privilege. I find that the claim is so barred, and that the contractual non-disparagement claim should be dismissed. As a result, I do not address Huizenga's other arguments for dismissal.[107]

---

[107] Huizenga also argues that dismissal (or, alternatively, a stay) is appropriate pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281 (Del. 1970) and that its Motion to Dismiss should be granted according to Rule 12(b)(6). Because I find dismissal is appropriate on other grounds, I make no determination as to *McWane*, Rule 12(b)(6) (except as it pertains to the absolute litigation privilege), and Huizenga's other arguments for dismissal.

*A. Standing*

While I address certain of Huizenga's other arguments for dismissal related to standing below, I primarily focus on Huizenga's argument that Opps is, in large part, seeking to assert the interests of others not present in this action. I agree with Huizenga in this regard, as it relates to Opps' confidentiality claim.

1. Standing

According to Huizenga, Opps lacks standing to bring this action. Standing is a threshold issue,[108] predicate to substantive consideration of a claim. The requirements for establishing standing in the courts of Delaware are generally the same as the standard established by the United States Supreme Court to govern standing in federal courts.[109] In general terms, the requirements for standing are: (1) an injury in fact, (2) causally connected to the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.[110]  "At the

---

[108] *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) ("Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers.").

[109] *Id.* at 1111 (citing *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994)).

[110] *Id.* at 1110 ("(1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (quoting *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175–76 (3d Cir. 2000)).

pleading stage, general allegations of injury are sufficient to withstand a motion to dismiss because it is 'presume[d] that general allegations embrace those specific facts that are necessary to support the claim.'"[111]

### a. Huizenga's Argument that Opps Lacks Subject Matter Jurisdiction, and Thus Lacks Standing

Opps seeks solely equitable relief, which invokes the jurisdiction of this Court of equity. Huizenga nonetheless challenges Opps' equitable standing because, according to Huizenga, an adequate remedy at law exists, money damages. Huizenga points out that other Ritchie parties in similar litigation have sought money damages. Per Huizenga, in light of available legal relief, equitable relief is unavailable and Opps, accordingly, lacks standing. Huizenga is, effectively, simply advancing an argument for dismissal for lack of subject matter jurisdiction, although it has not moved to dismiss according to Rule 12(b)(1).[112] Opps, for its part, points to the Operating Agreement, to which Huizenga agreed, which states that monetary damages would be insufficient to remedy a breach, and under which Huizenga agreed to not oppose equitable relief.

Given the fact that Opps seeks equitable relief *exclusively*, its request for injunctive remedies can hardly be pretextual. Upon review of the Amended

---

[111] *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).
[112] The Defendant has made no reference to Rule 12(b)(1) in its Motion to Dismiss or in subsequent briefing.

Complaint, I am convinced that Opps has properly invoked equity, and that subject matter jurisdiction exists. Therefore, Huizenga's standing argument in this regard fails.

### b. Injury in Fact

The quintessence of standing is that a plaintiff must have suffered an injury in fact.[113] The injury in fact requirement, like ripeness, ensures that a triable dispute, with proper litigation incentives on both sides, is presented to a court.[114] An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[115] "A 'concrete' injury must be '*de facto*'; that is, it must actually exist."[116] Concrete, however, does necessarily mean tangible; intangible injuries may also be concrete.[117]

### i. Opps Attempts to Vindicate Ritchie Energy's Rights

Huizenga avers that Energy dissolved "in fact, as early as 2006,"[118] and that at that time Energy's "name and goodwill" were lost as assets.[119] Additionally, per

---

[113] *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[I]njury in fact, the '[f]irst and foremost' of standing's three elements.") (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)).

[114] *Dover Hist. Soc.*, 838 A.2d at 1111 ("Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'") (citations omitted).

[115] *Id.* at 1110 (quoting *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175–76 (3d Cir. 2000)).

[116] *Spokeo*, 136 S. Ct. at 1548.

[117] *Id.* at 1548–49.

[118] Opening Br., at 32.

[119] *Id.* at 31.

22

Huizenga, to be effective, any assignment of claims must have occurred before dissolution. The assignment from Energy to Global occurred on November 27, 2017 (and from Global to Opps on February 6, 2018). Therefore, according to Huizenga, Opps lacks standing to bring this suit. That is, Huizenga argues that Energy had no name or goodwill to pass onto Opps for others to disparage after it dissolved in 2006, and no rights could have been assigned by Energy to Global, and ultimately to Opps, shortly before Energy's cancellation on November 27, 2017. This argument, put simply, is that Opps has failed to state a claim; as it relates to standing, I understand Huizenga's argument to be that Opps has not suffered any injury in fact because the rights it purports to enforce do not in fact exist. The Amended Complaint says nothing regarding dissolution, and Huizenga relies on "public reports" to support its claim that *de facto* dissolution occurred in 2006.[120] Opps has alleged in its Amended Complaint that Energy had certain rights, that Energy assigned those rights to subassignor Global before Energy's cancellation, and that those rights were further assigned to Opps.[121] This pleading is sufficient to sustain standing to enforce any rights so received.

---

[120] *Id.* at 32.

[121] Opps also argues that an explicit survival clause in Energy's Operating Agreement means that non-disparagement and confidentiality provisions survive dissolution. Answering Br., at 38–39.

Huizenga also contends, as an issue of standing, that the Delaware LLC Act prohibits Opps from raising the claims of a canceled LLC.[122] Opps argues that it is asserting claims it received via assignment before Energy's cancellation, and therefore, Opps is asserting its own claims, not those of a canceled LLC.[123] Huizenga has raised, at most, issues of fact regarding the vitality of the rights Opps asserts here, and at this stage of the proceedings, I assume Opps is asserting rights with legal puissance. I now turn to the Plaintiff's standing to assert its individual claims in light of the injury in fact requirement.

## ii. The Confidentiality Claim

Huizenga argues that Opps fails the injury in fact requirement of standing because Opps does not have a cognizable interest in the breach of the confidentiality provisions. Huizenga[124] and Opps[125] appear to agree that the Amended Complaint does not allege that Huizenga has breached—or threatens—the confidentiality rights of Opps, or of its transferor, Energy. Opps states forthrightly that it seeks to vindicate Huizenga's contractual obligation to Energy to protect *other RCM Parties'* confidential information, which, per Opps, Huizenga has failed to do in the course

---

[122] Opening Br., at 34–37.
[123] Answering Br., at 40–41.
[124] Opening Br., at 33 ("[Opps] never asserts that it was injured, i.e. that Huizenga misused or disclosed Ritchie Energy's confidential information.").
[125] Answering Br., at 39 ("The assignments, not the misuse of Ritchie Opps' own information, support Ritchie Opps' claims.").

of various litigations.[126]  Huizenga contends that it would be inappropriate for Opps to allege injury of an affiliate, without also joining the injured party,[127] and points to Court of Chancery Rule 17(a), whereby "[e]very action shall be prosecuted in the name of the real party in interest."[128]  It is clear from the Amended Complaint that Opps seeks to enforce Energy's contractual rights (if any) to prevent harm *to RCM Parties other than Opps or Energy*, incurred via Huizenga's breach of its confidentiality obligation.  In other words, Opps seeks injunctive relief for a harm imposed on others.

Opps does not allege that Huizenga breached its contractual confidentiality obligations in regard to *Energy's* confidential information.[129]  Opps also does not allege that Huizenga has disclosed *Opps'* confidential information.  Instead, Opps alleges that Huizenga has disclosed the confidential information of other RCM Parties.  However, Opps must plead that Opps *itself* suffered an injury in fact from Huizenga's breach of contract to have standing to litigate.[130]  Opps instead pleads

---

[126] *Id.* at 37 ("But Huizenga's contractual obligation not to disparage any RCM Party is not limited to Ritchie Energy's name and goodwill.").

[127] Reply Br. in Support of Its Mot. to Dismiss Am. and Suppl. Verified Compl. [hereinafter Reply Br.], at 22.

[128] Del. Ct. Ch. R. 17(a).

[129] Opps has alleged only that confidential information *related* to Energy has been disclosed. *See* Am. Compl. ¶ 82.  The confidential information appears to be "related" to Energy by the fact that Energy is a RCM Party. *See e.g.*, *id.* ¶¶ 63, 82.  It is not reasonable to infer, especially given the specificity of the allegations as to the confidential information that was disclosed, that Energy's confidential information has also been disclosed, and neither has Opps made even this conclusory allegation.

[130] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("To establish injury in fact, a plaintiff must show that *he or she suffered* 'an invasion of a legally protected interest' . . . . For an injury to

25

that certain RCM Parties, which have not been joined here, including *unidentified* RCM Parties,[131] have been harmed. I assume at this stage of the pleadings that Opps has standing to assert the rights of Energy, which it has obtained by transfer, as its own rights. The Subscription Agreement between Energy and Huizenga—creating Energy's rights that were transferred to Opps—includes (through incorporation of Energy's Operating Agreement) rights protecting third party beneficiaries, and *those parties* may pursue their rights against Huizenga; in fact, certain RCM Parties, as previously detailed, *have* brought similar litigation in their own names to prevent disclosure of their confidential information by Huizenga.[132] But, absent an injury in fact, Opps is without standing to vindicate those third-party rights, and its claim for breach of the confidentiality clauses is dismissed.

Huizenga also moves to dismiss for failure to join necessary parties under Court of Chancery Rule 12(b)(7). Given my decision here that Opps' confidentiality claims must be dismissed for lack of standing, I need not analyze whether the injured RCM parties are necessary, and their absence fatal, to this litigation. I note, however,

---

be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'") (emphasis added) (citations omitted); *see also Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) ("But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.").

[131] *See, e.g.*, Am. Compl. ¶ 82 ("Huizenga materially breached the Subscription Agreement and the Operating Agreement by knowingly and willfully disclosing confidential information related to Ritchie Energy, Ritchie Partners, Ritchie Capital, *and/or other RCM Parties*.") (emphasis added).

[132] These cases form the basis for Huizenga's arguments to dismiss under *McWane* and issue preclusion principles, which, due to my decision here, I need not reach.

in light of many of the same interests protected by the requirement of standing, that failure to join the parties injured in fact would form a formidable barrier to this litigation. The real parties in interest have the incentive to fully protect their own interests in a way Opps presumably does not. Opps seeks, and can only seek, injunctive relief here, because Opps has not suffered an injury from Huizenga's alleged breach of the confidentiality provisions. Presumably, the RCM Parties (if Opps is correct that Huizenga has breached their confidentiality interests) have actual injuries supporting damages or other remedies, not simply injunctive relief. This matter, if it proceeded to litigation, could have various outcomes: it could 1) vindicate Huizenga, 2) result in injunctive relief, or 3) settle; none of those results may make any truly-injured RCM Parties whole, yet it might bind them—or lead to inconsistent results—in any future litigation. If the matter were not dismissed for Opps' lack of standing, therefore, serious issues of failure to join necessary parties would be presented.

### iii. The Non-Disparagement Claim

I have found above that Opps failed to plead an injury in fact with respect to its confidentiality claim. Opps has, however, successfully pled facts from which I can infer that it has suffered—or is imminently threatened by—an injury in fact related to breach of the non-disparagement provisions of the Subscription Agreement between Huizenga and Energy. According to the allegations in the

27

Amended Complaint, disparagement of the "Ritchie" name and individual RCM Parties is detrimental to all RCM parties, including Opps, given the alleged importance of reputation in the private investment industry. Therefore, I can reasonably infer at this pleading stage that Opps has been or is imminently likely to be injured by Huizenga's disparagement of RCM Parties (because Opps' reputation has been damaged by association), even if Huizenga has not made disparaging statements specifically about Opps. Accordingly, I find that Opps has standing to assert this claim.[133]

*B. The Absolute Litigation Privilege*

Huizenga argues that the absolute litigation privilege bars Opps' claims for breach of both confidentiality and non-disparagement provisions. I have found that Opps' claim for contractual confidentiality must be dismissed for lack of standing, and I therefore address the absolute litigation privilege only with respect to Opps' remaining claim, contractual non-disparagement. Huizenga moved to dismiss the non-disparagement claim, citing the absolute litigation privilege, under Court of

---

[133] Again, because I find below that Opps has failed to state a claim for contractual disparagement, I need not address Huizenga's argument that the Amended Complaint must be dismissed for failure to join necessary parties. For the reasons already stated, however, that argument would be substantial.

28

Chancery Rule 12(b)(6), failure to state a claim.[134] I first discuss the absolute litigation privilege in Delaware, before applying it as a basis for dismissal here.

### 1. Delaware's Absolute Litigation Privilege

The parties disagree over which state's law on the absolute litigation privilege applies to this action. The alleged breaches of the non-disparagement provision of the contract have occurred, per the Amended Complaint, in pleadings in Illinois courts. However, the contract at issue contains a choice of law provision selecting Delaware law as the governing law.[135] Because the Plaintiff is seeking to enjoin a breach of a contract (between Delaware LLCs) that contains a facially valid Delaware choice of law provision, I apply Delaware law.[136]

The absolute litigation privilege, or simply the absolute privilege, was applied as early as 1497 in England.[137] As the Delaware Supreme Court recognized in *Barker v. Huang*, "[t]he absolute privilege is a common law rule, long recognized in Delaware, that protects from actions for defamation statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial

---

[134] Huizenga alternatively argued that the absolute litigation privilege provides common law immunity, and, therefore, creates a question of subject matter jurisdiction. *See* Opening Br., at 7–8.

[135] Am. Compl., Ex. A., at 12.

[136] Huizenga argues that Illinois or New York law should apply. Because the result I reach would be the same in any event, I am content to apply Delaware law.

[137] *Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 22 A.3d 710, 716 n.12 (Del. Ch. 2011).

29

proceeding and were relevant to a matter at issue in the case."[138] It is conceived as one of several affirmative defenses to a prima facie case of defamation "for statements made in certain contexts where there is a particular public interest in unchilled freedom of expression."[139] The context within which the absolute litigation privilege exists, as described, is the course of judicial proceedings, although the exact parameters of a "proceeding" can be difficult to define.[140] The public interest "purpose served by the absolute privilege is to facilitate the flow of communication between persons involved in judicial proceedings and, thus, to aid in the complete and full disclosure of facts necessary to a fair adjudication."[141] The absolute litigation privilege may also serve other purposes, such as "encouraging the peaceable resolution of disputes in the courts, fostering the willingness of witnesses

---

[138] *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992) (citations omitted). *See*, *e.g.*, *Klein v. Sunbeam Corp.*, 94 A.2d 385, 392 (Del. 1952) ("In the law of libel, privileged communications are divided into two classes, those absolutely privileged and those conditionally privileged. The class of absolutely privileged communications is limited to legislative and judicial proceedings.").

[139] *Barker*, 610 A.2d at 1344–45.

[140] *See, e.g.*, *Hoover v. Van Stone*, 540 F. Supp. 1118, 1122 (D. Del. 1982) ("The courts traditionally have applied the absolute privilege without differentiation to statements made during the course of formal pre-trial discovery procedures and other extra-judicial proceedings necessary to resolve pending litigation. For example, statements made during depositions, conferences between witnesses and counsel, and settlement negotiations, when pertinent to the underlying suit, have been deemed protected by the absolute privilege.") (citations omitted); *Paige Cap. Mgmt.*, 22 A.3d at 722–23 (assuming, without deciding, that the absolute litigation privilege may extend to pre-litigation communications); *BRP Hold Ox. LLC v. Chilian*, 2018 WL 5734648, at *5 (Del. Super. Oct. 31, 2018) (applying the absolute litigation privilege to statements made prior to judicial proceedings "so long as the statements were made in an effort to address the alleged grievance between the parties").

[141] *Barker*, 610 A.2d at 1345 (quoting *Hoover*, 540 F.Supp. at 1122).

30

to testify freely and counsel to argue zealously, and limiting the proliferation of follow-on lawsuits."[142]

The absolute litigation privilege "affords a complete defense [to the tort of defamation] irrespective of accuracy or malice."[143] That is because "the interest in encouraging a litigant's unqualified candor as it facilitates the search for truth is deemed so compelling that the privilege attaches even where the statements are offered maliciously or with knowledge of their falsity."[144] Delaware courts have held steadfast to the purpose of the absolute litigation privilege in other respects as well. For example, the Supreme Court held in *Barker v. Huang* that there is not a "sham litigation" exception to the absolution litigation privilege defense.[145] Neither is the absolute litigation privilege limited only to a defamation claim, as the "absolute privilege would be meaningless if a simple recasting of the cause of action from 'defamation' to 'intentional infliction of emotional distress' or 'invasion of privacy' could void its effect."[146] Instead, derogatory statements made in the course of judicial proceedings are privileged, "regardless of the tort theory by which the plaintiff seeks to impose liability."[147]

---

[142] *Paige Cap. Mgmt.*, 22 A.3d at 711–712.

[143] *Short v. News-Journal Co.*, 212 A.2d 718, 720 (Del. 1965). By contrast, a conditional privilege "affords protection only in the absence of malice." *Id.*

[144] *Barker*, 610 A.2d at 1345 (quoting *Nix v. Sawyer*, 466 A.2d 407, 411 (Del. Super. 1983)).

[145] *Id.*

[146] *Id.* at 1349.

[147] *Id.*; *see also Bove v. Goldenberg*, 2007 WL 446014, at *4 (Del. Super. Feb. 7, 2007).

This case presents a twist on the absolute litigation privilege: can the parties to a contract bind themselves to eschew derogatory statements, even in the context of legal pleadings or testimony? Then-Vice Chancellor Strine made it clear in *Paige Capital Management, LLC v. Lerner Master Fund, LLC* that policy interests—at least regarding admissibility of defamatory evidence—could limit the application of the absolute litigation privilege: "[The] policy reasons for maintaining the absolute litigation privilege, however, must be balanced against another important policy interest, namely, a person's right to be free from defamatory statements."[148] Here, there is, potentially, another balancing factor, freedom of contract, as the parties contracted prior to any litigation for a non-disparagement provision.[149]

I now turn to application of the doctrine to the facts.

### 2. Contractual Non-Disparagement and the Absolute Litigation Privilege

It is important to understand what, precisely, Opps seeks in this claim. Opps alleges that Huizenga has breached the Subscription Agreement by disparaging "Mr. Ritchie, [Energy], [Partners], [Capital Ltd.], and/or other RCM Parties," and cites, "without limitation," various statements made in litigations in Illinois. Opps does not allege it has been disparaged, but does allege that Huizenga's breaches of the

---

[148] 22 A.3d 710, 716 (Del. Ch. May 5, 2011)

[149] Neither *Barker* nor *Paige Capital Management* dealt with contractual non-defamation or non-disparagement provisions but dealt, respectively, with whether certain statements were defamatory and whether certain evidence was admissible. *Barker*, 610 A.2d at 1344–1348; *Paige Cap. Mgmt.*, 22 A.3d at 716 n.12.

32

non-disparagement clause have caused harm to Opps "by damaging its reputation" and have caused harm to "the brand and intellectual property of all RCM Parties." Opps does not seek money damages in its Amended Complaint; in fact, Opps argues that money damages are both too difficult to calculate and are inappropriate, given the purported irreparable harm to itself and the various RCM Parties.[150] Instead, Opps seeks, as sole relief, an Order "[t]emporarily, preliminary, and permanently enjoining Huizenga from disparaging [Opps] and/or its affiliated entities," that is, it seeks only prospective injunctive relief.[151]

Huizenga asks that I dismiss Opps' claim for breach of the non-disparagement provisions; according to Huizenga, Opps "does nothing more than couch a disparagement claim in terms of breach of contract," which (per Huizenga) is barred by Delaware's absolute litigation privilege.[152]

The Amended Complaint lists a number of disparaging remarks that Huizenga has made against RCM Parties, all of which occurred during the course of litigation.[153] Opps also avers that statements disclosing confidential information in litigation were false "and therefore are also disparaging."[154] While Opps conditions its list of disparaging remarks in its Amended Complaint as "without limitation,"[155]

---

[150] Answering Br., at 43–44.
[151] Am. Compl., at 28.
[152] Opening Br., at 11.
[153] *See* Am. Compl. ¶¶ 61, 73, 74, 91.
[154] *See id.* ¶ 70.
[155] *Id.* ¶ 91

33

it does not allege in the Amended Complaint, or in any subsequent briefing, that *any* disparaging remarks have been made outside of litigation. In addition, the Amended Complaint is devoid of facts from which I can infer an imminent threat of disparagement, outside of Huizenga's litigation efforts. Opps argues that it is attempting to enforce only its *contractual* rights and submits that "whether an independent contractual promise can be nullified by the litigation privilege – appears to be a question of first impression in Delaware."[156]

However, I find Opps' statement of the question presented (as also advanced by Huizenga) to be too broad. If I were to answer Opps' question as stated, I would risk an improper advisory opinion. Can a party disparaged in litigation seek its damages under a contractual non-disparagement clause, even though a tort action on the same facts is barred for public policy reasons?[157] Fortunately for me, this

---

[156] Answering Br., at 16.

[157] Other states have considered the question of whether a claim for breach of contract can be barred by the absolute litigation privilege, and "[c]ourts in a number of jurisdictions have concluded that the absolute litigation privilege is applicable to breach of contract actions, at least where immunity from liability is consistent with the purpose of the privilege." *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377 (7th Cir. 2010) (listing cases from several jurisdictions). For example, in Missouri the absolute litigation privilege is "based on the policy favoring freedom of expression and the desire not to inhibit parties from detailing and advocating their claims in court and is absolute, regardless of motive." *Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2003). Therefore, while "[an appellant's] actions in criticizing and disparaging [the appellee] and in threatening to destroy [the appellee's] reputation may serve as the basis for court-initiated sanctions, [ ] they do not constitute a breach of contract within the confines of the lawsuit" because "[t]he pleadings and other written communications were all related to the litigation, and [the appellee] has not presented evidence of any statements that were made outside the scope of the litigation." *Kelly*, 352 F.3d at 350. In California, the courts have clearly stated that "whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege." *Wentland v. Wass*, 25 Cal. Rptr. 3d 109, 114 (Cal. Ct. App. 2005).

interesting issue is not before the Court, given the posture of this litigation. I need only to decide whether the absolute litigation privilege, and the public interests behind it, prevent *equity* from specifically enforcing, prospectively, the contractual non-disparagement clause in the context of litigation, via injunction. The answer to that question is yes.

Here, Opps seeks injunctive relief in order to forestall litigation that is disparaging of the RCM Parties or Ritchie entities, whether or not the alleged disparaging statements are true. This, to my mind, raises the same interests as using tort law to chill litigation—as proscribed by the absolute litigation privilege—but in the even more problematic realm of prior restraint. Far from vindicating contractual rights, such a use of equity would, in fact, render contract rights effectively unenforceable. That is, if a breaching party can prevent its counterparty, via injunction, from making "disparaging" statements in litigation alleging the breach, then the counterparty would be unable to enforce the contract because it could not effectively prosecute, or even prosecute at all. In effect, that is precisely the result Opps seeks here. Equity will not lend itself to a prior restraint of speech,[158] and it

---

[158] This Court recognizes the "traditional maxim that equity will not enjoin a libel." *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 115 (Del. Ch. 2017) (internal quotation marks omitted); *see also Capstack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *4 (Del. Ch. Aug. 16, 2018). While the rationale for the rule has changed over time, "[t]he upshot is the same: a court of equity generally cannot issue an injunction in a defamation case." *Organovo*, 162 A.3d at 119; *see also Capstack*, 2018 WL 3949274, at *4. Readers interested in the origin and development of this rule should consult Vice Chancellor Laster's thoughtful examination in *Organovo Holdings, Inc. v. Dimitrov*. 162 A.3d 102. This equitable principle does not stand alone,

will not support specific performance of a contractual non-disparagement provision as a prior restraint to prevent enforcement of the same contract.[159]  By extension, the absolute litigation privilege prohibits (at least) the equitable prohibition of litigation-related utterances, under the rubric of a contractual non-disparagement clause.  Such an injunction would impermissibly chill the pursuit of justice via litigation, no less so than permitting analog tort claims in the litigation context.  Such an impermissible exercise of equity is the only relief Opps seeks here.

Therefore, I find that the Plaintiff has failed to state a claim on which relief can be granted, and the claim for contractual non-disparagement is dismissed.

### III. CONCLUSION

Opps brought this action for breaches of confidentiality and non-disparagement contract provisions.  For the reasons stated above, those claims are dismissed.  I note, however, that outstanding motions on ancillary issues persist.  The parties should consult and inform me of what matters remain to be decided, in light of my decision here.  A final order shall then issue.

---

the Delaware Constitution also "appears to explicitly prohibit prior restraints."  *Capstack*, 2018 WL 3949274, at *4 (citing Del. Const. art. I, § 5, which states that "any citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty").

[159] This is not to say that this Plaintiff or the other beneficiary parties to the contracts may not seek confidentiality with respect to any filing, nor does it prevent applications for sanctions for bad faith litigation, where appropriate. *See, e.g.*, *Kelly*, 352 F.3d at 350 (stating that disparaging actions "may serve as the basis for court-initiated sanctions").